JANUARY TERM, 1883, NO. 159.            MARCH 19, 1883.

# Miskey's Appeal.

1. An inquisition, whether of lunacy or habitual drunkenness, where the finding is affirmative, is only *prima facie* evidence of mental infirmity during the period found, and its effect is to shift the burden of proof to the party asserting capacity.   Where the finding is merely negative it can have no greater effect.

2. In a proceeding in a court of chancery to set aside an alleged improvident and voluntary deed partly upon the ground that the mind of the grantor had become greatly weakened and impaired by the long

[Miskey's Appeal.]

continued and excessive use of alcoholic liquor, and not upon the mere technical statutory fact of habitual drunkenness, the conscience of the Court, if satisfied of the truth of the allegation upon the whole of the evidence taken, would not be relieved by the statement that a jury of laymen in another proceeding to declare the party an habitual drunkard had found that the charge was not established.

3. The absence of a power of revocation in a voluntary deed is a circumstance which throws the burden of proof upon the party taking the benefit under the deed, and in the absence of proof of a distinct intention to make the deed irrevocable, if the other circumstances of the case require it, the conveyance will be set aside.

4. Where there was a voluntary deed from a son to his father, mother, and sister of his entire estate, the grantor, having at the time a wife, for whom no provision was made, and a son for whom there was an inadequate provision, the father being of affluent circumstances, and the mother and sister being entirely comfortable, and requiring no provision; the deed containing no power of revocation, and there being no proof that the grantor was conscious of that fact, or that his attention was called to it, and a revocable deed being just as serviceable for his purpose as one that was irrevocable; the grantor being at that time, and for many years previously, a person of grossly intemperate habits in an almost constant state of intoxication with mind and body greatly impaired and enfeebled thereby; the relation of parent and child existing between the principal grantee and the grantor; and there being no proof by any of the grantees independently of the deed itself, that it was the intelligent, deliberate, and free act of the grantor, done of his own desire and accord; and no proof that the transaction was righteous and conscionable. and the evidence indicating with great force that the execution of the deed was procured by the active exertion of the parental influence of the father; the deed having been executed without independent advice of counsel representing the grantor alone, and having been prepared by one who was counsel for the father; the deed will be set aside.

Before MERCUR; C. J., GORDON, PAXSON, TRUNKEY, STERRETT, and GREEN, JJ. CLARK, J., absent.

Appeal of Elizabeth E. Miskey, Edward H. Hance, and Charles W. Otto, executors of Anthony Miskey, deceased; Elizabeth E. Miskey, Edward H. Hance, and Charlotte E. Hance, his wife, from a decree of the Court of Common Pleas, No. 1, of *Philadelphia County*, dismissing the exceptions to and confirming the master's report in a suit brought by Maria E. Miskey, administratrix of Jacob A. Miskey, deceased, against the appellants and others, to declare void a deed of trust from Jacob A. Miskey to Anthony Miskey.

On June 26, 1875, Jacob A. Miskey executed a deed of trust to his father, Anthony Miskey, which provided that "the said Jacob A. Miskey for and in consideration of the sum of five dollars to him in hand paid by the said Anthony Miskey at and before the ensealing and delivery hereof the receipt whereof is hereby acknowledged hath granted bargained sold assigned transferred and set over

released and confirmed and by these presents doth grant,
bargain, sell, assign, transfer and set over unto the said
Anthony Miskey his heirs executors administrators and
assigns and to him and them doth hereby release and con-
firm all and singular all the estate and property of him
the said Jacob A. Miskey whatsoever and wheresoever
including the capital stock certificates of the Pennsylva-
nia Railroad Company the Reading Railroad Company
the Lehigh Valley Railroad Company and all other
companies, and all public loans, to which he is in any
manner entitled in law or equity and every part thereof.
To have and to hold the estate and property hereby
granted assigned transferred sold released and confirmed
or intended so to be and every part thereof and all
dividends interest or income accrued or to accrue thereon
to the said Anthony Miskey his heirs executors adminis-
trators and assigns forever. *In trust* however that he the
said Anthony Miskey shall receive the dividends income
*permit the said Jacob to*
and interest thereon and at his discretion sell and reinvest
the same and any part thereof and pay the dividends in-
terest and income thereof to the said Jacob A. Miskey for
*shall be only received by*
and during the term of his natural life, and from and
after the death of the said Jacob A. Miskey then in trust to
pay to Clarence A. Miskey his son the sum of ten-thou-
sand-dollars out of the sale of said securities either the
whole or any part thereof in the discretion of the said An-
thony Miskey as he shall think it best for the interests of
the said Clarence and until such payment or payments to
pay to the said Clarence interest at six per cent. on said
sum of ten-thousand-dollars or so much thereof as he shall
not have paid out of the principal sum and as to the rest
and residue of all said estate and property *In trust* to pay
assign transfer and divide the same equally and share and
share alike to and among the father of the said Jacob
A. Miskey, to wit : the said Anthony Miskey, Elizabeth
E. Miskey, the mother of the said Jacob A. Miskey
and Charlotte E. Hance the sister of the said Jacob A.
Miskey and in case either of said three persons shall die
before the said Jacob A. Miskey then the share or shares
of said deceased persons shall go to and absolutely vest
in the survivor or survivors. And it is expressly pro-
vided that on the request of the said Jacob A. Miskey
in writing consented to in writing by the said Anthony
Miskey, he the said Anthony is hereby fully authorized

to transfer to the said Jacob A. Miskey such of said securities as it may be expedient in case of any emergency or other sufficient cause to hand over to him for his own individual use, without accounting to the trust hereby created."

Jacob A. Miskey died on December 16, 1875, and letters of administration on his estate were granted to his widow, Maria E. Miskey. He left but one child, a son, Clarence A. Miskey. The administratrix, on September 6, 1876, filed a bill in equity, setting forth, *inter alia*, that the plaintiff was the widow and administratrix of Jacob A. Miskey, who died on December 16, 1875; that she was married to him on October 6, 1856; that Jacob A. Miskey had been for many years of very intemperate habits; that she accordingly had commenced proceedings in habitual drunkenness against him, which resulted in the filing of an inquisition on July 2, 1875, which the plaintiff traversed; that at the time of his death Jacob A. Miskey was possessed of upwards of $70,000, invested in certain stocks (mentioned in the bill); that because of his intemperate habits the plaintiff was compelled to leave her husband on August 14, 1874; that the deed of trust was contrived by Anthony Miskey, Elizabeth E. Miskey, and Charlotte E. Hance to defraud the plaintiff; that the same was procured by fraud and undue influence, and while Jacob A. Miskey was enfeebled by disease, and while his mind was impaired from his intemperate habits, and that it should be declared void for inadequacy of consideration.

The bill prayed (1) for an injunction restraining the several corporations mentioned in it from allowing a transfer of any stock standing in the name of Jacob A. Miskey; (2) that the deed of trust might be declared fraudulent and delivered up for cancellation; (3) that the several corporations might be required to allow the plaintiff to transfer said stocks and receive the dividends thereof; (4) further relief.

The answer of the defendants denied that Jacob A. Miskey had been for many years a man of intemperate habits, or that his health and mental faculties had become impaired by intemperance. It admitted the proceedings in habitual drunkenness against Jacob A. Miskey, and averred that the inquisition found that he was not an habitual drunkard. It denied all the charges of art, contrivance, fraud, combination, or endeavors to possess themselves of Jacob A. Miskey's property and the exertion of any influence. It denied that he was en-

feebled by disease, or that his mind was impaired from any cause at the time of the execution of the said deed, and averred that he was perfectly competent to execute said deed, and that he executed it of his own 'free will and accord, and that he was not under the control of Anthony Miskey, but that he had counsel and advice of an upright member of the bar, (William L. Hirst,) who prepared the deed by the order of Jacob A. Miskey ; that there was a good consideration for the execution of the said deed, and that he executed and delivered it without fraud, deception, contrivance, importunity, undue*influence, or any other cause or thing affecting said deed.

The case was referred to George Junkin, as examiner and master, who filed his report February 24, 1882, in favor of the plaintiff, "reporting as a fact that at the time of the execution of the deed Jacob A. Miskey was an habitual drunkard, and had been so several years previously thereto ;" that his "continuous course of dissipation did affect Jacob A. Miskey's mind, which was not originally a very strong one ;" that Mrs. Anthony Miskey and Mrs. Hance were not on good terms with Mrs. Maria E. Miskey, (Jacob's wife,) whose husband's affection for her always continued ;" "that this deed was not the intelligent act of Jacob A. Miskey when in the fair possession of his faculties, and was procured by undue parental influence." The decree reported was that the deed of trust was fraudulent and void, and should be delivered up to be canceled.

On April 15, 1882, the Court below, PEIRCE and BIDDLE, JJ., dismissed all the exceptions, confirmed the master's report, and on April 28, 1882, entered a decree, as reported by the master, against the defendants, with costs.

The defendants then took this appeal, assigning as error, *inter alia*, the action of the Court in decreeing that the deed of trust executed by Jacob A. Miskey to Anthony Miskey was fraudulent and void ; in decreeing that the said deed should be delivered up to the complainant to be canceled, and in confirming the master's report.

*Francis E. Brewster* and *William A. Porter* (with whom was *F. Carroll Brewster*) for appellants.

The deed of trust was the act of Jacob A. Miskey, while in full possession of his mental faculties, and at the time of its execution he was free from the control of any undue influence. His habits, temperate or intemperate,

except so far as they produced mental incapacity, do not enter into the inquiry. The *onus* was on the plaintiff to prove the facts alleged in her bill.

The finding, a few days before the execution of the deed, of the jury in the habitual drunkard proceedings, that Jacob A. Miskey was not an habitual drunkard, is binding and conclusive against the parties until set aside: 1 Greenleaf on Evid., s. 556; Stokes *v.* Dawes, 4 Mason, 268; Sergeson *v.* Sealey, 2 Atk., 412; Den *v.* Clark, 5 Halstd., 217; Hart *v.* Deamer, 6 Wend., 497; Faulder *v.* Silk, 3 Camp., 126.

The fact that a traverse of the finding had been filed by the petitioner is no answer: Purdon's Digest, 982, pl. 16; Frey's Est., 3 W. N. C., 371; McGinnis *v.* Commonwealth, 24 Smith, 248; Rogers *v.* Walker, 6 Barr, 375. But there is no evidence which so bears upon the question of time at which the deed was executed as to affect its integrity, and this the law requires, to an approximate degree at least. Even the master reports that "there was no, or very slight, evidence of any bad or imprudent bargains made" by Jacob A. Miskey.

*George M. Conarroe* and *Samuel C. Perkins* for appellee.

The facts alleged in the bill were proved beyond all doubt. The finding of an inquisition of lunacy or habitual drunkenness is but *prima facie* evidence, whichever way it be; it shifts the burden of proof, nothing more; it is not conclusive: Sill *v.* McKnight, 7 W. & S., 244; Leckey *v.* Cunningham, 6 P. F. S., 370; Klohs *v.* Klohs, 11 P. F. S., 245; McGinnis *v.* Commonwealth, 24 P. F. S., 245; Bennet *v.* Vade, 2 Atkyns, 324.

It is not necessary, to invalidate a deed, that proof of intoxication or mental incapacity at the time of its execution be adduced: Jones' Appeal, 37 Leg. Int., 376; S. C., 11 W. N. C., 258.

Nor is the *onus* on the plaintiff, as appellants contend, to prove specific and actual fraud at the time of the execution of the deed; the contrary of this is well settled: Cuthbertson's Appeal, 1 Out., 163; Darlington's Appeal, 5 Norris, 518; Jenkins *v.* Pye, cited by appellants, is overruled by Taylor *v.* Taylor, 8 How., U. S. Rep., 201, as to the particular point for which it is relied upon.

The deed of trust was prepared by William L. Hirst, who was Anthony Miskey's attorney. Jacob A. Miskey had no "independent advice" of any kind; and there is

no proof that the deed was ever read by or to him, or that he understood it.

Without reference to actual fraud, the absence of a power of revocation in the donor requires clear proof that he expressly directed it to be omitted, and in the absence of such proof the deed will be set aside : May on Voluntary Conveyences, 451 ; Russell's Appeal, 25 P. F. S., 269, 289.

The burden of proof is on the person claiming the benefit under the deed. The beneficiary must clearly and affirmatively show that the grantor or donor (*a*) fully knew what he was doing ; (*b*) was entirely competent to act ; (*c*) was wholly free from undue influence ; (*d*) had independent advice ; (*e*) that the transaction was righteous : Comstock *v.* Comstock, 57 Barbour, N. Y. Rep., 453, 470 ; Boyd *v.* Boyd, 16 P. F. S., 283, 293 ; Rhodes *v.* Bate, Law Rep., 1 Chanc., App. Cases, 252, 257, 259, 261 ; Turner *v.* Collins, Law Rep., 7 Chanc., App. Cases, 329 ; Savery *v.* King, 5 H. of L. Cases, 627, 657, 663 ; Hoghton *v.* Hoghton, 15 Beavan, 278, 298, 299, 305, 314 ; Cooke *v.* Lamotte, *Ibid*, 241, 245, 249 ; Boyd *v.* De LaMontagnie, 73 N. Y., 498.

October 2, 1883.—The opinion of the Court was filed by GREEN, J :

This was a proceeding on the equity side of the Court below. It was a bill, the purpose of which was to procure a decree, setting aside a voluntary conveyance, made by a son to his father, of the whole of his estate upon certain trusts therein stated. The property conveyed was personal estate, and by the terms of the deed the income was to be received by the grantor during his life. After his death, the grantee was to pay ten thousand dollars, at his discretion, to the only child of the grantor, and the remainder of the estate was to be divided equally between his father, mother, and sister.

The value of the property conveyed was about $70,000, and the only consideration for it stated in the deed was the sum of five dollars, which, it is said and not denied, was never paid. Jacob A. Miskey, the grantor, had a wife and one child, a son, about fifteen years of age, at the time of his death. No provision whatever was made for the wife and none for the child, except the payment of $10,000, in the manner stated. The deed contained no power of revocation. Miskey's wife and child were living apart from him at the time of his death, and for some sixteen months prior thereto, the separation having been

occasioned, as was alleged and found by the master, by his habits of gross and long-continued intoxication and disorderly conduct in his household.   The deed was impeached upon various grounds, principally want of consideration, undue influence exerted by the father, mother, and sister, great mental weakness resulting from his long-continued and excessive use of intoxicating liquor, and fraud and deception practiced upon him by the donees named in the deed.   An answer was filed denying the allegations of the bill, and, after replication, the case was referred to a master, who reported a decree declaring the deed to be fraudulent and void, and ordering it to be delivered up to be canceled, and ordering also a return of the various stocks and securities conveyed by the deed. An examination of the master's report discloses the various considerations upon which his findings of facts and law were based.   He does not find that the deed from Jacob A. Miskey to Anthony Miskey, his father, was procured to be made by actual fraud and imposition practiced upon the son by his father, but that certain facts were shown to have existed, and certain other facts, which ought to appear in support of such an instrument, do not appear, and are not to be found in the testimony, and that the combined effect of these affirmative and negative facts is such that an inference of fraud arises sufficient to invalidate the deed.   Thus he finds that the conveyance was purely voluntary and without consideration ; that it contained no provision whatever for the support of the wife of the grantor, and no adequate provision for the support of his only child ; that the grantor had, for several years before, and up to the time of the execution of the deed to his father, been given to habits of gross intoxication and to the excessive and inordinate use of alcoholic liquors, insomuch that he had become, and was, an habitual drunkard ; that the deed contained no power of revocation, and that there was no testimony in the case showing that this fact was known to him, or was, in any manner, explained to him ; that it did not appear that the deed was read over or explained to him at or before its execution ; that the grantor was, at the time the deed was signed, and always had been, especially subject to the parental influence of his father, and that, from all the testimony in the case, it was fairly to be inferred that the deed was procured to be made by means of the exertion of that influence ; that the grantor entertained a strong affection for both his wife and his child, and that they had done nothing to forfeit either his affection or their right to adequate

protection and support from him and his estate ; that the
grantor had become very much impaired, both in mind
and body, in consequence of his excessive use of alcoholic
liquor, and that the deed to his father was not the intel-
ligent act of Jacob A. Miskey when in the fair possession
of his faculties.    The master applies the equitable rules
that the absence of a power of revocation from a voluntary
deed conveying the property of a grantor is a circum-
stance which may be availed of to set aside the deed on
the ground of mistake, and that where one occupying a
confidential relation with another takes a voluntary bene-
fit from the person reposing the confidence, he is subject
to a duty to prove affirmatively that the conveyance was
the intelligent and deliberate act of the grantor, free from
the exercise of the influence of the relation existing be-
tween the parties.    As to many of these findings there is
no controversy.    There is no question that the conveyance
was purely voluntary ; that it contained no provision for
the support of the wife, and a provision of but ten thou-
sand dollars for support of the child.    As the estate trans-
ferred amounted to seventy thousand dollars, we think it
clear that ten thousand dollars, or one seventh of the
whole, was an inadequate provision for the child, a mere
inspection of the deed shows that it contains no power of
revocation, and there is no testimony that it was Jacob
A. Miskey's expressed desire that it should contain no
such power, or that the fact of its omission was explained
to him, or in any way known to him.    It is also quite
clear that he was much attached to both his wife and child,
and treated them with kindness and a sincere affection
when in the full possession of his faculties.    There is
nothing in the testimony showing that either of them had
done anything to forfeit his regard for them or their right
to his protection and support from his estate.    The act of
his wife in leaving him was occasioned solely by his habits
of intoxication and his conduct when in that condition.
The master has so found, and the evidence abundantly
justifies his finding on that subject.    The only remaining
matters of fact involved in the controversy are those which
relate to his use of liquor and habit of intoxication, and
the effect thereby produced upon his mind, and the extent
and character of the parental influence to which he was
subject, and its employment in producing the execution
of the deed in question.

There is considerable testimony in the case of persons
who saw Jacob A. Miskey with greater or less frequency,
and say that they never, or very seldom, saw him intoxi-

cated; most, perhaps all, of these witnesses testify that, in their opinion, he was of sound mind, capable of transacting business, and of making contracts, and of ample testamentary capacity. A number had business transactions with him and base their opinions upon those transactions, and upon the negative fact that they did not see him intoxicated. Of course a great deal of this testimony is of a negative character, and the opinions expressed are necessarily affected to some extent by that consideration. One who is frequently drunk may, nevertheless, in his sober moments, have adequate capacity for the transaction of business. In this case it is not disputed that Jacob A. Miskey accumulated quite a fortune, and there is no evidence that he had made unfortunate transactions or squandered his means. Were there no other evidence in the case except the testimony of the witnesses to whom we are now referring, we should regard the contention of the appellants as sustained on this branch of the case. But when we regard the character and extent of the testimony on the other side, and the great number of the witnesses who testify to facts observed by themselves, of almost daily occurrence, who had the very best opportunities of observation, whose testimony is not contradicted, who had no motive for concealing or exaggerating the truth, we cannot resist the conclusion that the master's findings on this subject were not only justified, but demanded by the evidence before him. It is not necessary, and would scarcely be proper, to review in detail, in this opinion, the whole of the testimony on this subject. It came largely from bartenders and saloon-keepers from whom he was in the daily habit of obtaining liquor, and from police officers, who, at his father's request, watched him, cared for him, and frequently took him home in a condition of gross intoxication. One of the witnesses, John Able, junior, who was a saloon-keeper, and had known him for many years, and said he was a drinking man from 1850, described his habit of coming to his saloon and getting his flask or bottle filled every week, and thus testified: "During 1868 and 1869, the bottle would average about once a week, and three times a week with the flask during the same week. The flask, generally Monday, Wednesday, and Friday, and the bottle on Saturday, for 'home use,' which was his remark; I considered him a great drinker from 1868 to 1875—in the fall. There was very little deviation. He was worse as a drunkard toward 1874 and 1875. I have, indeed, seen a great many hard drinkers; I must say one thing for Jacob Miskey,

that during the years 1873, 1874, and 1875 I never saw a man in such a beastly state of intoxication so often as I saw him.   It appeared to me, and I saw him nearly every morning, about a quarter of ten in the morning, that he was in a beastly state of intoxication at that hour in the morning on his way to the office." After describing Miskey's habit of constant and excessive drinking with much more detail, the witness said further: "His memory in 1874 and 1875 seemed to be very much impaired, because I don't think he could recollect what occurred from one hour to another.   In my opinion, he was most undoubtedly an habitual drunkard.   During 1874 and 1875, I don't think that, mentally, he retained his manhood." . . . "In 1874 and 1875, I did not consider him a sane man. He acted like as if his brain was diseased—softening, or something or other—I did not in fact consider he was a responsible man for his actions during those two years. I do not consider that during those two years he was capable of properly conducting business." . . . "I think those things [a number of facts to which he had testified] indicated that his mind was unsound.   He was imbecile or idiotic."

James M. West, a member of the bar, who occupied an office in the rear of that of A. Miskey & Son, said: "I suppose I saw young Jacob Miskey every day.   Had to pass his office-door to get into mine. . . . I think he was the hardest drinker for a man of his age that I ever knew. . . . I don't think I ever saw him when he was entirely sober.   He would be tolerably free from liquor in the early part of the morning, but by two or three o'clock in the afternoon he would be very drunk.   This was a constant occurrence.   He manifested it very often by making most terribly uncouth noises in his room, to the great annoyance of myself and those in my office. . . . I have had occasion to go into his office, and found him frequently in such a condition that he would be unable to understand and apparently to answer a question that I would ask him. . . . Personally, he had all the appearance of being a habitual drunkard, very much bloated, and the general appearance of a man who drinks hard. . . . As far as I can judge, most of the time he was not in condition to attend to any business at all.   What little business I had with them I always transacted with the father on that account.   I did not consider him fit to attend to business. . . . I mean to say this: that my judgment was that he went to bed drunk at night, was so thoroughly saturated with the liquor that it wasn't

worked off him in the morning by the night's sleep, and that when I would see him the next morning he was still under the effects of a previous day's dissipation."

Frederick Day, also a member of the bar, having an office in the same building, across the hall from A. Miskey & Son, testified: "He was unquestionably a constant drinker, there is no doubt about that. . . . His appearance was that of a man who was, to put it plainly, soaked in whisky. . . . He really looked to me, and his speech and action indicated that he was a man who was semi-idiotic, imbecile. I wish to be understood that it was not the mere temporary effect of whisky, but he seemed to have got to that point where he was becoming—well, idiotic is the only expressive word."

William P. Jones, who was a bartender, first at Prosser's, on Market street, and afterwards at Price's restaurant, on Chestnut street, said he first knew Jacob A. Miskey at Prosser's in 1865, where he would come about three times a week, get a drink and his flask filled, and was then a moderate drinker. Afterwards he saw him at Price's until in July, 1875. At the latter place, the witness testified, "he used to come there twice every day. I was behind the bar. He would come there about nine or ten—about ten—and get whisky, and I would fill his flask generally every morning, and also at noon. At dinner time he would get his flask filled." . . . "When I saw him at Price's he used to drink more. It grew on him. I can hardly describe it. He would take about half of an ordinary bar tumbler full of whisky."

Being asked how Miskey ranked as a whisky drinker, as a moderate one or otherwise, he answered: "Otherwise. I should say he excelled any one I ever saw." . . . "I have seen him intoxicated. For the last three years I could hardly tell when he was not intoxicated. He was of very full habit, flushed about his face. He indicated a man that drank very hard. A man that did not know him would say that. I have frequently seen him stagger, generally before three, somewhere in the neighborhood of one, when he came to dinner. Q. So far as you were able to judge during the last three years, what was his mental capacity? A. He didn't really seem to know, sometimes, what he had said to me a few minutes before. I judge it was excessive drinking that did it. . . . Q. In your opinion, was he or was he not a habitual drunkard? A. He was; a confirmed drunkard for the last three years. I could scarcely tell when he was sober; if he was, it was in the morning when he first came." George R. Stocker,

who lived next door to Miskey during 1874 and to the time of his death, after describing occasions when he saw him intoxicated, was asked: Q. In your opinion, was Mr. Miskey, during the time you knew him, an habitual drunkard or not? A. Yes, sir; he was undoubtedly; that is, I would say that eighty or eighty-five per cent. of the time that I knew him, I should say he was drunk. Q. What was his capacity, as far as you know, to transact business? A. I should say he had none at all for transacting business." William H. Price, who was a restaurateur at Prices', on Chestnut street, said that he knew Jacob A. Miskey from 1860, but more particularly from 1871, when he came to his father's restaurant, where he was cashier. "He visited our place, on an average, four or five times a day. . . . He came there mostly to drink whisky. He would get a small flask filled with whisky, which I judge he carried in his pocket. He would first come between nine and ten, A. M., on his way to his office, I judge. He came to drink whisky. When he first came in the morning, or at no time, was he perfectly sober; he was generally not sober by no means; he was trembling, and he acted to me more like a man who was getting off a spree." The witness further describes the frequency of Miskey's drinks, and was asked: Q. What was his mental condition? A. Well, I think it was very poor. I have seen a great many drinking and drunken men; I think he excelled all men I ever did see in regard to drink; I don't think, in my opinion, he was able to take care of himself after he left me. . . . I have had conversations with him. He appeared not like a man to me, but a child. He talked more foolishness and he appeared more like a child. His memory was poor." . . . "I think he was an habitual drunkard."

The foregoing are mere fragments of a huge mass of testimony of a similar character, which abundantly justifies the findings of the master, on this branch of the case, in the following words:

"He became more and more the victim of his intemperate and insatiable thirst for whisky. His sprees were frequent, and more than once he had the delirium tremens. He would come home and be brought home by policemen and others at all hours of the night drunk, and when in that condition he would behave himself in a rude, noisy, and unkind manner to his wife and child, breaking the furniture, and behaving in such a manner that the house was not a quiet and desirable home, and he annoyed and disturbed his neighbors. His debauches would last

for a week or more, to be followed by sickness at home, when his wife and mother would nurse him. His habits were such, and so well known, that when he would be away from the place of business of the firm, his father would apply to the police to find him and get him to go home; and this applies to the police officers in Germantown as well as those in the city. Frequently nurses and police officers were employed by Mr. Anthony Miskey to nurse and take care of him when he was gotten off from his debauches and was sick in consequence.

The result of these debauches, and the excessive amount of whisky he drank, began to tell upon his physical condition. He became slovenly in his habits; his appearance became that of a drunkard; he was bloated and besotted and maudlin-looking; he appeared to be saturated with liquor; he was bloated, and had the general appearance of a man who drinks hard. In the early part of the day he would be tolerably free from liquor, but towards the afternoon he would be well drunk, and would make uncouth noises in his office, such as loud hallooing, imitating cats, barking like a dog, and various other noises. Some of the witnesses describe him as having the appearance of a man soaked in whisky. At the taverns where he had his debauches his performances were so filthy as to be unfit for further description in this report. He reeled in the streets of the city, in the highways of Germantown, and became a shame and a disgrace and humiliation to his own and his wife's family. . . . At one time Mr. Anthony Miskey consulted physicians in reference to the propriety of putting him in an asylum, but this unfortunately was never done.

He was attended repeatedly by his physicians in his sickness, produced by his excessive use of whisky, and he was by them remonstrated with on the subject, but it was of no avail . . . The master has no hesitation in reporting as a fact that at the time of the execution of the deed Jacob A. Miskey was an habitual drunkard, and had been so for several years previously thereto. . . . He had "a fixed habit of drunkenness." He was "habituated to intemperance whenever the opportunity offered." And he himself made the opportunity of filling his flask, silently drinking by himself, hiding his stores of whisky in unusual places about the house and getting continually drunk. And this state of things continued during the last six or eight months of his life, covering the period of the execution of the deed of trust. A patient and attentive examination of the testimony satis-

fies us that all the details of this finding were fully estab-
lished by the evidence before the master.   It was argued
that because the proceeding in habitual drunkenness
resulted in a finding by the jury that Jacob A. Miskey
was not an habitual drunkard, that finding is conclusive
upon the parties and cannot now be impeached.   We do
not regard this position as tenable.   All the authorities
concur in holding that the inquisition, whether of lunacy
or habitual drunkenness, is only *prima facie* evidence of
mental infirmity during the period found, and its effect
is to shift the burden of proof to the party asserting
capacity: Sill *v.* McKnight, 7 W. & S., 244; Leckey *v.*
Cunningham, 6 P. F. S., 370; Klohs *v.* Klohs, 11 P. F.
S., 245; McGinnis *v.* Commonwealth, 24 P. F. S., 245.
As this is the rule in cases where the finding is affirmative
of the fact of lunacy or drunkenness, it certainly can
have no higher effect where the finding is merely nega-
tive.   Moreover this is a proceeding in a court of chancery
to set aside an alleged improvident deed, partly upon the
ground that the mind of the grantor had become greatly
weakened and impaired by the long-continued and ex-
cessive use of alcoholic liquor, and not upon the mere
technical statutory fact of habitual drunkenness.   The
conscience of the Court, if satisfied of the truth of the
allegation upon the whole of the evidence taken, certainly
would not be relieved by the statement that a jury of
laymen in another proceeding to declare the party an
habitual drunkard had found that the charge was not
established.   This would be so even if the evidence in the
two proceedings were the same, much more would it be
so where, as here, considerably more testimony was given
before the master than before the jury.   The proceedings
were not the same nor was the issue the same.   But in
any event, the *prima facies* of the inquest has been over-
thrown by the preponderating testimony taken before the
master.

The finding of the master, that Miskey was an habitual
drunkard, has no relation to the proceeding in habitual
drunkenness.   It does not affect it one way or the other.
He does not declare that, because he has so found, the
deed of trust is void, but he uses the facts found by him
to show the character of Miskey's mental qualifications
to appreciate and execute the deed.   He thus states the
bearing of the fact of habitual drunkenness found by
him upon the case:   "Yet this fact, and all others in
this connection, have a material bearing upon the main
question, whether the deed was the intelligent act, unin-

fluenced, of a man competent, by reason of the full possession of his faculties, to execute such an instrument."

On the question of parental influence, the master finds that Jacob A. Miskey never passed beyond the parental influence or control of his father. He was with his father as clerk before he attained majority, and, on the day he became of age, his father took him into partnership, and this relation continued for eighteen years. After that, and to the time of his death, he continued under his father's care and influence. A strong mutual affection at all times subsisted between them, and the master reports that there was no reason to doubt "what a very intelligent witness said about them : 'There was no man alive that could do with Jacob Miskey what his father could ; I think he would do for his father what he would not do for any living person on earth, 'from his affection and regard for his father.' " After the dissolution of the partnership, which was the act of the father, in 1873, he was still employed and paid some compensation by his father for some months, his rent and other bills were paid through his father's bank account, and the counsel who defended him in the proceeding in habitual drunkenness were employed and paid by his father. During his last sickness, and for some time before, Anthony Miskey came to his son's house every day, controlled him in the use of money, paid the servants, and gave orders, shortly before his son's death, that Jacob's wife or son should not be left alone in the room with him. Many other facts showing the character and extent of the influence and control exercised by Anthony Miskey over his son, as set forth in the master's report, are fully established by the testimony, and, indeed, are not contradicted by any opposing testimony. The master also finds that there was no reasonable motive shown for the deed, as Jacob's father was a man of wealth and his mother and sisters were well provided for, and, in his rational moments, he always regarded his wife and son with great affection. He further finds, upon uncontradicted testimony, that, apart from the facts of execution and acknowledgment, there is no evidence that Jacob A. Miskey read the deed or heard it read, or that he clearly understood its effect ; and that there was no affirmative evidence to show that he knew there was no power of revocation in the deed, or that he had a deliberate intent to make the deed irrevocable. The master sums up his report on this branch of the case thus : " The whole testimony in the cause, with all the circumstances surrounding the deed, satisfies the master that

the deed of trust was the result of the undue parental influence of Anthony Miskey." We think this conclusion is a legitimate deduction from the evidence. These facts being established, the legal and equitable principles applicable to the case render it of comparatively easy solution.

In Russell's Appeal, 25 P. F. S., on p. 289, AGNEW, C. J., referring to the effect of the absence of a power of revocation in a marriage settlement, and the necessity of an intent to make the gift irrevocable appearing in the case, says: "The cases cited by the master show very distinctly that the actual intent of the donor is necessary, and in the absence of a certain intent to make the gift irrevocable, the omission of a power to revoke is *prima facie* evidence of a mistake, and casts the burthen of supporting the settlement upon him, who, without consideration or a motive to benefit him or protect the donor, claims a mere gratuity against one who is *sui juris* and capable of taking care of his own estate." The report of Mr. Robb, the master in that case, which was ordered to be printed with the opinion of the Court, contains a most able and exhaustive review of the law in such cases. He cites a number of recent English cases, which were fully recognized as authoritative in the opinion of the Court. Among others is that of Wollaston *v.* Tribe, Law Rep., 9 Eq., 44, in which it was held that a person taking a benefit under a voluntary gift which is not subject to a power of revocation has thrown upon him the burden of proving that the gift was meant by the donor to be irrevocable, and that a voluntary gift not subject to a power of revocation, but not meant to be irrevocable, may be set aside by the donor. In Coutts *v.* Acworth, Law Rep., 8 Eq., 558, it was held that the party taking a benefit under a voluntary settlement or gift containing no power of revocation has thrown upon him the burden of proving that there was a distinct intention on the part of the donor to make the gift irrevocable. In Hall *v.* Hall, Law Rep., 14 Eq., 365, it was decided that "where, in a voluntary settlement of real estate, a revocable deed would have answered the settler's purpose as well as an irrevocable one, the absence of a power of revocation is *prima facie* evidence of mistake, and that evidence can only be rebutted by showing that the settler had his attention pointedly called to the fact that the instrument was irrevocable, and that he could have equally effected his purpose by a revocable one."

Of course, it is not pretended, and the master in the

present case did not decide, that the mere absence of a power of revocation is sufficient, of itself, to set aside the instrument.    But that fact is a circumstance which throws the burden of proof upon the party taking the benefit; and in the absence of proof of a distinct intention to make the gift irrevocable if the other circumstances of the case require it, the conveyance will be set aside. Other authorities to the same effect are Hugenin v. Baseley, 14 Ves., 273; Phillipson v. Kerry, 32 Beav., 628; Garnsey v. Munday, 13 Am. Law Reg., N. S., 345; May on Voluntary Conveyances, 451.

It needs only to be added in this connection that there was no affirmative proof of a distinct intention on the part of Jacob A. Miskey to make this gift irrevocable, nor is there any proof that his attention was ever called to the subject.

In regard to the effect of the parental relation, and the influence thereby exerted upon the transaction, the authorities are very clear, and are strikingly applicable to the facts of this case.    This Court has adopted and enforced the most advanced equity doctrines upon this subject.    In Darlington's Appeal, 5 Norris, 518, Mr. Justice Trunkey, in delivering the opinion of this Court, said: "Constructive fraud often exists where the parties to the contract have a special, confidential, or fiduciary relation, which affords the power and means to one to take advantage of or exercise undue influence over the other. Whenever from such relation considerable authority or influence necessarily exists on the one side and a corresponding reliance and confidence is placed on the other a party will not be suffered to abuse this authority or influence by extracting any advantage to himself.    A transaction between persons so situated is watched with extreme jealousy and solicitude, and if there be found the slightest trace of undue influence or unfair advantage redress will be given to the injured party.    Owing to the near connection between the parties in many relations, the transaction itself is considered so suspicious as to cast the burden of proof upon the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge and that the arrangement is fair and conscientious."    In Turner v. Collins, Law Rep., 7 Ch. App., 329, the Lord Chancellor Hatherly said: "If the father himself takes a benefit there arises the jealousy of the Court and we have to consider how the child's intention was produced.    And even if we find the intention which the instrument describes, still the question arises, how

has that intention been produced ? Influence is a thing which is assumed as between father and child, not that the influence is assumed to be unduly exercised, but that the influence is assumed and it is then thrown upon the father, if he takes any benefit to prove what is called the righteousness of the transaction, and the Court has to see that every proper protection was thrown around the child, and that the child has deliberately and advisedly, and under protection, done that by which his father has obtained a benefit." In the same opinion the chancellor thus describes the character of the parental influence to be apprehended and guarded against : "When we talk of parental influence we do not think of terror in connection with it—that is not the primary idea—it is not terror and coercion, but kindness and affection which may bias the child's mind and induce the child to do that which may be highly imprudent, and which, if the child were properly protected, he would never do."

This is the very kind of influence which existed in an eminent degree between Anthony Miskey and his son. In Heguenin *v.* Baseley, 14 Ves., 273, Lord Eldon thus presents the subject : "Take it that she intended to give it to him, it is by no means out of reach of principle. The question is, not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced ; whether all that care and providence was placed round her as against those who advised her, which, from their situation and relation with respect to her, they were bound to exert on her behalf." In Hoghton *v.* Hoghton, 15 Beav. 278, the master of the rolls said : "I am of opinion, as I lately held in a case of Cook *v.* Lawotte, that whenever one person obtains by voluntary donation a large pecuniary benefit from another, the burden of proving that the transaction is righteous, to use the expression of Lord Eldon in Gibson *v.* Jeyes, falls on the person taking the benefit. But this proof is given if it be shown that the donor knew and understood what it was that he was doing. If, however, besides obtaining the benefit of this voluntary gift from the donor, the donor and donee were so situated towards each other that undue influence might have been exercised by the donee over the donor, then a new consideration is added and the question is not, to use the words of Lord Eldon in Huegenin *v.* Basely, whether the donor knew what he was doing, but how this intention was produced, and though the donor was well aware of what he did, yet if his disposition to do so was produced by undue influ-

ence, the transaction would be set aside. In many cases the Court, from the relations existing between the parties to the transaction, infers the probability of such undue influence having been exerted."

In Rhodes *v.* Bate, Law Rep., 1 Ch., App. Cases, 252, Lord Justice Turner said : "I take it to be a well established principle of this Court that persons standing in a confidential relation towards others cannot entitle themselves to hold benefits which those others may have conferred upon them, unless they can show to the satisfaction of the Court that the person by whom the benefits have been conferred had competent and independent advice in conferring them. This, in my opinion, is a settled general principle of the Court, and I do not think that either the age or the capacity of the person conferring the benefit or the nature of the benefit conferred affects this principle." In Savery *v.* King, 5 House of Lords Cases, p. 627, the Lord Chancellor said : "I must not be understood as questioning the position that a son may give up all or any portion of his property to his father without consideration. Undoubtedly he may do so, but then it is incumbent on the father, accepting such a benefit, to satisfy the Court before which the transaction is impeached that the son fully understood what he was doing ; that no artifice or contrivance was made use of to induce him to do the act complained of, and that the son had competent means of forming an independent judgment. The father is bound to make this out."

The same doctrine was asserted and applied in the cases of Comstock *v.* Comstock, 57 Barb., 453, and Boyd *v.* De LaMontagnie, 73 N. Y. Rep., Court of Appeals, 498, and by this Court in cases of wills giving benefits to the persons who were instrumental in procuring their execution, in Boyd *v.* Boyd, 16 P. F. S., 283 ; Cuthbertson's Appeal, 38 Leg. Int., 124, and in Jones' Appeal, 39 Leg. Int., 52, which was a voluntary deed set aside by the Court below, affirmed by this Court, Sharswood, C. J., saying : "It is sufficient to invalidate any instrument executed by a person of weak intellect, to show that the person in whose favor it is framed held a situation of confidence with respect to the maker of such instrument."

In reference to the matter of "independent advice" it is to be observed that the deed was prepared by Mr. W. L. Hirst, a very eminent member of the bar of this Commonwealth, but that gentleman had previously been, and was at the time, the counsel of Mr. Anthony Miskey, and, in point of fact, he was employed and paid by the latter

to defend his son in the proceedings in habitual drunkenness. In these circumstances Mr. Hirst cannot be regarded as the independent adviser of Jacob A. Miskey in the matter of the deed of trust, in which Anthony Miskey was so largely interested. Did time and space permit, it would be interesting and instructive to point out the many circumstances which indicate the presence and exertion of the parental influence of the father in procuring the execution of the deed of trust. But this work has been so well and ably done in the report of the learned master that it is unnecessary to repeat it here, and the already too great length of this opinion is admonitory of the necessity of curtailment.

It has seemed to us appropriate to dwell with rather more than usual fullness upon our review of the case, because of the unusual character of the questions involved and the relief involved, the very large amount at stake, and the earnestness, zeal, and ability with which the argument was conducted by the learned counsel on both sides. In brief, the controversy presents to us the case of a voluntary conveyance by a son to his father, mother, and sister of his entire estate, less a small provision for the only child of the grantor, the latter having at the time a wife for whom no provision was made, and a son for whom there was an inadequate provision, the father being of affluent circumstances, and the mother and sister being entirely comfortable and requiring no provision; the deed containing no power of revocation, and there being no proof that the grantor was conscious of that fact, or that his attention was called to it, and a revocable deed being just as serviceable for his purpose as one that was irrevocable; the grantor being at the time, and for many years previously, a person of grossly intemperate habits, in an almost constant state of intoxication, with mind and body greatly impaired and enfeebled thereby; the relation of parent and child existing between the principal grantee and the grantor, and there being no proof by any of the grantees independently of the deed itself that it was the intelligent, deliberate, and free act of the grantor done of his own desire and accord, and no proof that the transaction was righteous and conscionable, and the evidence indicating with great force that the execution of the deed was procured by the active exertion of the parental influence of the father, the deed having been executed without independent advice of counsel representing the grantor alone, and having been prepared by one who was counsel for the father. In our judgment,

[Appeal of the Pennsylvania Industrial Home for Blind Women.]

so strong a combination of circumstances against the validity of the instrument in question is not found in any of the reported cases ; and upon a most patient and careful review of the entire case, we cannot but think that the decree recommended by the master, and made by the Court below, is required by the principles we have considered, and the practice of the courts, is most consonant with the teachings of reason, of justice, and humanity, and, therefore, demands the sanction and approval of this Court.

Decree affirmed at the costs of the appellants.